## W. E. BERRY & CO. v. J. H. BURNETT.

### Decided May 9, 1900.

**1. Continuance.**

Where a first application for continuance was refused, but the case was reset for a later day of the term, and being then called continuance was again applied for by the same party, the application did not come under the statutory rule, but is addressed to the discretion of the court.

**2. Trial by Court—Weighing Testimony.**

The court trying a case without a jury was not bound to accept as true the uncontradicted testimony of a party as to his damages.

**3. Damages—Held Not Inadequate.**

See evidence under which an assessment of damages for delay in completing, according to a contract, a building leased during construction was held not inadequate.

**4. Contract—Execution—Stamping Corporate Name.**

Affixing, by the bookkeeper, by means of a stamp, to a written contract, by direction of the managing officer of the corporation, its corporate name, in form: "Houston Horse, Mule, and Livery Co., Per ————," constituted a signing of the instrument.

**5. Contract—Performance—Acceptance.**

Acceptance, by the promissee, of an imperfect compliance with a contract is equivalent to performance.

APPEAL from Harris County, Fifty-fifth District. Tried below before Hon. WM. H. WILSON.

*Hutcheson, Campbell & Myer,* for appellants.

*Ewing & Ring,* for appellee.

COLLARD, ASSOCIATE JUSTICE.—Appellee concedes that the statement of the nature and result of the suit is correctly made by appellant, and it is adopted, as follows:

On the 21st day of March, 1899, J. H. Burnett filed this suit, in the District Court of Harris County, against W. E. Berry & Co., alleging substantially that the plaintiff rented defendants, W. E. Berry & Co., a firm composed of W. E. Berry, A. L. Towles, and Thos. T. Robey, a building in Houston for a livery business, which was evidenced by a written lease for five years (copy of which lease marked Exhibit "A" was attached to the petition) for $125 per month; that the defendants paid the first month's rent and refused to pay the remaining seven months, which would amount to $750.

Plaintiff further represents that he did extra work, at various times up to December, 1898, on said stable, at the request of the defendants, which amounted to $430 (which said extras were likewise itemized in Exhibit "B," attached to the petition).

Wherefore, the plaintiff sued the defendants for the sum of $1180, with 6 per cent interest. Appellants answered by general demurrer and general denial, and further answered, setting up that they were engaged in the business of buying, shipping, and selling horses and mules from other States to this point, which was known by plaintiff, and for that purpose said building was leased. That, at the time the lease marked Exhibit "A" was executed, there was nothing at all on the ground, but at the time of its execution, the plaintiff, J. H. Burnett, promised defendants to build on said ground a two-story livery and feed stable, which should be ready by the first of September and should be the best in the South, built of first-class material, and in a first-class, workmanlike manner, with a water tight roof, fifty-six stalls, 5x9x12, with iron feed boxes, iron gutters, brick or asphalt floor; two offices of certain specifications, water and sewer connection. Further there were to be suitable windows on both floors for ventilation, etc., the floors of second story were to be be corked and pitched, so that no water could run through; and various other specifications were given. But, as it is, the defendants represent that none of the promises were complied with by J. H. Burnett, but that a most shabby and second-class barn was given, detailing the deficiencies in said barn and the lack of compliance by plaintiff with his promises. They further represent that water ran through the floor, which should have been corked and pitched, destroyed their vehicles, and that there was no asphalt or brick floor at all. That there were no windows in the barn, and that the barn was not turned over to them in any condition until about the 1st of October. Wherefore, they have been damaged, by the failure of plaintiff to complete the barn, in the sum of $200 per month from the time said barn was to be completed until the present time, and in the further sum of $500 for being forced to tend and keep their stock in the State of Missouri for six weeks, owing to the failure of plaintiff to complete the barn within the specified time.

Plaintiff responded with a supplemental petition setting up the fact that the defendants had accepted said barn as completed, by virtue of an instrument executed by them, of date December 21, 1898, signed by the Houston Horse, Mule and Livery Company (a copy of which was at-

tached to the petition marked Exhibit "A"). To which the defendants, Berry & Co., filed a supplemental answer, stating that they went into the possession of the barn under protest before it was completed, upon the express promise of the plaintiff, that, if they would take possession, he would complete it as speedily as possible to their entire satisfaction.

The defendant further denied, with a sworn plea of non est factum, the pretended acceptance relied upon in his supplemental petition. Case was called for trial June 8, 1899, when the defendants announced not ready on account of absence of several witnesses who had been duly subpoenaed. Whereupon the court postponed said cause to June 17th. Immediately thereupon the defendants reissued subpoenas for the same witnesses and others, tendering to one the legal fee. On June 17th the case was called for trial, when certain witnesses of the defendants were absent, among others the one to whom the fee had been tendered, and all of whom had been duly subpoenaed and were living in Harris County, Texas, which facts were incorporated in a motion for continuance by the defendants, which was by the court overruled, and the trial was ordered, which resulted in a judgment for the plaintiff for the sum of $675 and for the defendants for $75 damages for delay in completion of stable beyond time agreed for its completion, which was duly excepted to by the defendants, and notice of appeal given.

*Findings of Fact.*—We find the facts as follows: The contract of lease by plaintiff to defendants, of date July 14, 1898, is as follows:

"State of Texas, County of Harris.—This contract made and entered into this the 14th day of July, 1898, by and between J. H. Burnett of Galveston, Texas, of the first part, and W. E. Berry & Co., of the second part, witnesseth:

"First. The party of the first part leases to the party of the second part for the period of five years, commencing the 1st day of September, 1898, ending the 31st day of August, 1903, the following described property, to wit: North half ($\frac{1}{2}$) of lot No. two (2), all of lots Nos. three (3) and eight (8), and parts of lots Nos. eleven (11) and twelve (12), in block forty-seven (47), Harris County, Texas, S. S. B. B., with the improvements thereon, except fifty (50) feet fronting on San Jacinto Street, running back to a depth of forty-six (46) feet, also one hundred (100) feet running on Caroline Street, running back to a depth of forty-six (46) feet, including the second and third stories fronting on each street retained by the party of the first part.

"Second. For and in consideration of the above premises, the party of the second part agrees to pay to the party of the first part one hundred and twenty-five ($125) dollars per month for the first twelve months, and one hundred and fifty ($150) for the remaining forty-eight months, payable in advance on the first day of each month.

"Third. And should there, at any time, be any default in the payment of any rent due, or in any of the covenants herein contained, then it

shall be lawful for the party of the first part to re-enter the said premises and remove all persons therefrom, without prejudice to any remedies which may be used for the collection of rent, all and every claim for damages, for or by reason of said re-entry being hereby expressly waived.

"Fourth.   At the expiration of this lease, the party of the second part agrees to quit and surrender the said premises in as good state and condition as a reasonable use and wear thereof will permit.

"Fifth.   The party of the second part is not to sublet the said premises, or any part thereof, without written permission from the party of the first part.

"Sixth.   It is expressly understood and agreed by and between the parties hereto that the party of the first part shall have and by this contract has a valid first lien upon all the goods, furniture, chattels, or property of any description belonging to the party of the second part, as a security for the payment of all rent due or to become due.   Any and all exemption laws in force in this State, by which said property might be held, are hereby expressly waived.

"Witness our hands at Houston, this 14th day of July, 1899.

(Signed)     "J. H. BURNETT, First-Part.

"W. E. BERRY,

"For W. E. Berry & Co., Second Part.

"A. L. TOWLES.

"The State of Texas, County of Harris.—Before me, J. O. Ross, notary public in and for Harris County, Texas, on this day personally appeared J. H. Burnett, W. E. Berry for his firm W. E. Berry & Co., and A. L. Towles, who are known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they executed the same for the purposes and considerations therein expressed.

"Given under my hand and seal of office, this 14th day of July, A. D. 1898.

(Signed)     "J. O. Ross,

"Notary Public, Harris County, Texas."

Plaintiff read in evidence the following written agreement:

"Houston Horse, Mule and Livery Company, 409 to 411 San Jacinto St., Telephone No. 798.

"HOUSTON, TEXAS, Dec. 21, 1898.

"Mr. Burnett.—We agree to accept the stable at 409 San Jacinto Street as completed after the following things have been done:

"1.   Put mangers in the box stalls on south side of barn and fix boxing around same stalls so that horses can not get their feet fastened.

"2.   Change the partition now around the water closet to the office on opposite side of barn.

"3.   Put one more door in each office and wainscot south office.

(Signed)     "HOUSTON HORSE, MULE AND LIVERY CO.

"Per ————."

J. H. Burnett testified as follows: "In the summer of 1898 Mr. Harvey Wilson came to me with Mr. Berry and wanted me to build a stable on the lots described in my petition. They presented me a rough drawing of the kind of house they wanted on a piece of brown paper. The first house that Mr. Berry talked to me about building was a corrugated iron building, something cheap. I told them I would not build that sort of a house on those lots; they were too valuable. Afterwards we agreed upon a kind of house to build and the plan of the house. My first proposition to defendants was to build them a house on those lots, of brick, and subdivide it into stalls and mule pens as they wanted, reserving twenty-five feet front on Caroline Street and twenty-five feet on San Jacinto Street on the second floor, giving defendants all of the first floor and all of the second floor between our reservations above mentioned, and charge them $200 a month rent for it. We dickered for some time about this proposition, and defendants told me it was more than they wanted to pay for a house, and we finally agreed that I should reserve forty-six feet on San Jacinto Street of the second floor, and forty-six feet on Caroline Street of the second floor, and rent the building to them for five years, for $125 a month for the first year, payable monthly, and $150 a month for the next four years, payable monthly. We then entered into a contract of lease, and I rented them the stable." The contract has been before set out, which was identified by the witness as the contract made, and his testimony proceeds:

"I had begun to build the house before the contract was made. * * * The walls were partially up, and made as high or higher than the second floor. The building was to be completed and ready for use on the 1st of September. I did not want to let them have the building for $125 a month, but as I had agreed to let them have it at that, I completed it according to my contract and turned it over to them. The house was not entirely completed on the 1st of September, 1898, but it was nearly so, and it was sufficient for defendants to use for their purpose at that date. * * * The fact is, I had the building practically completed on the 1st of September, but Mr. Towles and Mr. Berry were not satisfied with the work, and had me to tear it down and rebuild almost the whole inside of it. I objected to doing it, because I contended that it was already according to my contract. The items of extras charged in my original petition were for work done by me on this building the second time, and as I think beyond my contract. I had the work done changing and rebuilding the troughs in the mule pens at the instance of Mr. Berry; $70, I think, was a reasonable bill. Berry did not promise to pay me that bill, but when he wanted the work done I protested against doing it; I told him I wanted them to pay for it, but he said for me to do the work and we would settle that matter later. For excavating and flooring six stalls for express horses, $45; that was not in the contract. They wanted this change made and insisted upon its being done and I did it." He charged $40 for enlarging a concrete basin for washing buggies, at request of defendants, which is a reasonable charge; and he paid

plumbers $15 for water pipes, $140 for pulling down and changing fifty-two stalls, and building seven extra box stalls $35, and $40 for plank floor, all at request of defendants, the prices named being reasonable,—all extra work more than the original contract called for; and for changing water closet $22.50, which is also a reasonable price. The place of the water closet was changed three times at request of defendants. The office and partitions, with three extra doors, were also changed three times in the same way, at a cost of $22.50, the charge being reasonable. Burnett protested to doing the extra work, as he did not think the contract required it; but they insisted upon it and he did it, he telling them he would expect them to pay for it, they replying to him to "go ahead, and they would see about it when we got through." On cross-examination the witness Burnett also stated that he agreed to build for defendants a first-class barn, out of first-class material, what he insisted he had done, but didn't say anything about a first-class, workmanlike manner. "I did," he says, "turn them a first-class barn. I promised them the best barn in the South, and I think it is. I agreed to build this stable with the mule pens and the stalls, with eight mule pens and fifty-two stalls, and do not remember the exact number of box stalls. * * * I finished the mule pens as the contract required; but when Berry came, he ordered them all torn down and built in a different way. * * * I changed the water troughs and feed troughs in these pens twice, notwithstanding Mr. Towles had given me the measurements of the heights to put these water and feed troughs before I built them, and built them according to the measurements given me by Mr. Towles. Then Berry objected to the stalls upstairs, insisting that they were not according to the contract, and finally I tore them down and built them just exactly as he wanted them. They are all the same width, and hallway between is exactly what the contract calls for. I did not agree to put in iron boxes in these stalls, and iron caps on them, and an iron drain pipe behind each stall; that was not my promise. The floor for this second story where the horses were to be kept was sufficiently tight for the purpose of stabling horses up there, and I think I made it tight. I did not cork and pitch it, because the floor was so tight that I could not cork it. I got a bale of oakum and tried to cork it, but I would have to make a crack to put the oakum in, the floor was so tight. * * * The windows in this building—the original contract did not have any windows at all, but we afterwards agreed to put in the windows and I left them open, because the defendants asked me to do so; they said it was cooler for the stock and better. I did not agree to put in a brick or asphalt approach into this stable from the curbstone on the street, running back twenty-five feet into the stable. I did not agree to build the offices twelve by twenty-five feet long; they were twelve feet wide and twenty feet long. The end of the office on San Jacinto Street was not closed up until sometime about when the weather got cold, because defendants did not want it closed up; they said it was better left open. I closed that up as soon as they asked me. I first put some gates there, and they

asked me to tear them down and put some doors that would slide back behind the office. I left the side of the building next Wall & Stabe's lot open until late in the fall, because my original plan was to build another house, and adjoin it to this brick wall; besides, defendants asked me to leave that open, because it would be cooler and better ventilated for the mules. I do not remember just when I closed this end up, but it was some time in the winter when cold weather set in. It was not finished in September nor October, but do not remember whether it was November or December when I closed it up. * * * I closed it up with cement and plaster, using steel laths. The windows were not filled with sash and lights all the way, because Mr. Ruby and the defendants herein asked me to put in the top sash and box up the bottom part; that the mules would break out the glass, and when they wanted ventilation they could let the sash down from the top. I did not agree to give them a bedroom in this building, and I have not given them one. The purpose that defendants intended to use this building for was known to me, that is, they told me they wanted to buy and sell mules and horses, and keep a livery, feed, and sale stable, and they told me that they were going back to Missouri and some of those States to buy mules and horses in the summer, and they were to have the stables for the purpose of putting mules and horses in by the 1st of September, 1898. I had the stable ready for them by the first of September, so that they could put all their mules and horses in it they had at that time. In fact they did put in some at that time. I was called upon a great many times by these defendants to make these changes and repairs that I have made on that building; and the fact is they worried my very soul out by insisting on these changes and repairs. I would make them just as often as they asked me to, and just exactly like they wanted. I would send my carpenters there and let Mr. Berry and Mr. Towles tell them how they wanted it, and do it that way; and this thing went along in that way, and I continued to make the repairs and improvements as they insisted upon, until the latter part of December, when I finished the building according to all of their requirements. The end next to Wall & Stabe's vacant lot, that was left open—water did come in there on one or two occasions from a very heavy storm, and wet the flooring of the first and second floor, but I did not shut that up any sooner than I did because the defendants did not want it shut up. They told me to leave it just as it was,—said it was better for the stock and gave them more ventilation. The defendants have not paid me any rent except for the first month; they gave me that about the time of the making their contract sued upon. * * * I do not know of my own personal knowledge whether the things required to be done by the agreement dated the 22d of December, 1898, were done or not, except the door in the office. I know that was put in, because I could see in passing that it was in. I know that I sent my men to do them [the other requirements of the agreement of December 22, 1898]."

It was proved that the work was done and performed according to the terms of the agreement of December 22, 1898, except the fixing of

boxing around stalls, so that horses could not get their feet fastened, and that was not done because defendants said they did not want it done.

Since the original lease contract was made, defendants incorporated under the name of the "Houston Horse, Mule and Livery Company."

R. H. Moore testified (and we find the facts stated by him are true, as credited by the lower court), in reference to the execution of the instrument of December 22, 1898: "I said to Mr. Berry that I wanted those articles drawn up according to our agreement. Mr. Berry and I were right at the office door, and we both stepped in the office, where the bookkeeper, Payton Elder, was, and Mr. Berry told the bookkeeper to draw up the paper, and he did so; and when he got it done, he handed it to me and I says, 'That is all right, Mr. Berry.' Then Mr. Berry said to Mr. Elder to sign it and he took a pen and put on that signature and then handed it to me. The bookkeeper put in something there which was erased on the document,—shows it was crossed out by the book-keeper. This document was read over so that Mr. Berry could hear it; Mr. Berry was standing right by me. I could not be positive that the document was handed to Mr. Berry, but the bookkeeper read it over and we were all standing there right together. Mr. Berry told the book-keeper to sign it, and he put the stamp on it and handed it over to me." The stamp was the signature of Houston Horse, Mule and Livery Company. Burnett had sent the witness Moore over to settle the matter, stipulating as in the agreement what should be done to conclude the matter, and we find that it was signed and executed by authority of defendants.

In regard to compliance with the agreement of December 22, 1898, the witness Moore truthfully testified: "I did that work satisfactory to Mr. Berry, and no complaint was made after it was done. As to changing the partition, changing water closet, etc., that was all done. The mangers in the box stalls were changed and run across the entire distance, which work took me perhaps half a day. The work of fixing those box stalls, so the horses can't get their feet fastened, was the work of perhaps one whole day for one man."

The witness did the work under the direction of Berry and to his satisfaction. The court rendered judgment for the whole amount of the rent due, less $75 damages for delay. Giving credit to the testimony of plaintiff's witnesses, the judgment of the lower court is sustained by the evidence.

The court below overruled defendants' application for a continuance, filed June 17, 1899, made on account of the absence of W. M. Roberts, W. J. Williamson, Kid Ollse, William Loftus, and Henry Wooly. The court approved a bill of exceptions to the action overruling the applica-tion to continue because of the absence of three of the witnesses,—Kid Ollse, William Loftus, and Henry Wooly. The bill as approved by the court states that "on the second day of the term, the case was set for trial on June 8, 1899, and called for trial on that day. The defendants not being ready, were allowed till 2 o'clock of that day to prepare an

application for a continuance, and the application, filed June 8th, and referred to and made a part hereof, was then presented. The court deeming the application insufficient for a continuance, refused to grant it, and reset the case for June 17th. The case being called for trial on that day, the defendants presented their motion for continuance filed June 17, 1899, with the two subpoenas attached, which motion was by the court overruled, to which defendants excepted, etc., with respect to the witnesses above named. A subpoena was issued for the three above witnesses, who are residents of Houston, on June 8, 1899, commanding them to appear on that day, and was returned served on that day, before call of the court [case?] for trial. All of said witnesses disobeyed said subpoenas, as appears from application filed June 8, 1899, above referred to. After the court refused to grant said motion filed June 8, 1899, another subpoena was issued for said witnesses (said subpoena attached to application for continuance of date June 17, 1899), sheriff's return of date June 14th, showing service on said parties."

*Opinion.*—1. We do not find error in the action of the court below in denying the application for a continuance. The matter was in the discretion of the court, and it can not be said that that discretion was abused. Hunt v. Makemson, 56 Texas, 12.

2. We can not say the court was in error in refusing to allow defendants below other credits besides the $75 allowed for delay in having the building fully completed by the 1st day of September, 1898. Defendants went into possession on that date, though the building was not quite complete, and occupied it, and for this delay in completing the structure in all its details the credit was allowed. We can not say it was not sufficient. The court had the power and it was its duty to hear the testimony and weigh it. The alleged expense of feeding stock in Missouri and the testimony relating thereto was a matter for the court's determination, and there is no rule to compel the court to receive as true the testimony as proof of the item charged. There is nothing in the record that would justify us in declaring that the court erred in the adjustment made allowing only the credit mentioned. There was testimony of defendants that they had to stop stock in Missouri procured for the Houston stable, and feed the same, the expense of which was occasioned by the fact that the stable was not ready by the 1st day of September, but the court was not bound to accept the testimony of the parties as true; besides this, there is some testimony that the stable was in a condition to have accommodated the stock said to have been stopped and fed in Missouri, if defendants had used reasonable care to save the loss alleged. We do not think we should revise the ruling of the lower court as insisted, or reverse the judgment on that ground.

3. We can not say that the court should have allowed more than $75, the amount that was allowed for alleged failure to have the stable completed according to contract by the 1st day of September.

4. There was testimony that the agreement of December 21, 1898,

was executed by authority of the defendants, by which matters then in dispute were adjusted, and that the special undertakings of Burnett therein named were performed, except such as were expressly relinquished and refused by defendants. This performance settled all matters of former dispute as to the fitness of the building for the purposes of defendants, and the facts show that the performance thereof, though not in full as to every particular, was accepted by them. They can not complain of the agreement nor of its performance.

We have considered all the objections assigned by appellants to the judgment of the lower court, and upon examination of the record find that none of them should be sustained. Appellant has not assisted us in his brief as the rules prescribe, in some instances, in statements from the record which would put us in possession of all the facts and proceedings necessary to an understanding of the issues presented, but we have examined the record and by the aid of appellee's brief have been enabled to supply the matter omitted; and after full consideration, have concluded that there is no error in the judgment of the lower court, and it is affirmed.

*Affirmed.*